# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **FLORIDA ROCK INDUSTRIES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 13-0499-WS-B** |
| | ) | |
| **ESCAMBIA SAND & GRAVEL** | ) | |
| **COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter comes before the Court on Defendant Escambia's Rule 12(c) Motion for Judgment on the Pleadings (doc. 26) and Plaintiff's Cross Motion for Judgment on the Pleadings (doc. 30). Both Motions have been briefed and are now ripe.

## I.    Background.[1]

This declaratory judgment action arises from a dispute as to the enforceability and termination provisions of a lease for excavation of sand and gravel from certain tracts of land in Escambia County, Alabama. Plaintiff, Florida Rock Industries, Inc. ("Florida Rock"), entered into a Lease Agreement (the "Original Lease") with defendant, Escambia Sand & Gravel Company, Inc. ("Escambia Sand"), on or about September 14, 2005. Pursuant to the Original Lease, Escambia Sand leased certain lands to Florida Rock for excavation of commercially viable sand, gravel, clay, topsoil and overburden. In return, Florida Rock agreed to make royalty

---

[1]    When considering a motion for judgment on the pleadings, courts "must accept the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party." *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001); *see also In re Northlake Foods, Inc.*, 715 F.3d 1251, 1255 (11th Cir. 2013) ("When reviewing a ruling on a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), we accept as true all allegations in the complaint and construe them in the light most favorable to the nonmoving party."). For purposes of each party's Rule 12(c) Motion, then, the Court accepts as true the well-pleaded factual allegations of the other side's pleading. Any material discrepancies between the parties' respective versions of the facts will be duly noted.

payments to Escambia Sand pursuant to a specified formula, with a minimum guaranteed monthly payment of $20,000 (to be adjusted for inflation). On June 26, 2006, the parties entered into the First Amendment to Lease Agreement (the "Amendment"), doubling the minimum royalty payment to $40,000 per month after Escambia Sand acquired two additional tracts of land for lease to Florida Rock for excavation of sand and gravel.[2]

Now, eight years after execution of the Amendment, Florida Rock and Escambia Sand disagree as to the enforceability of the Original Lease / Amendment (together, the "Lease") and the proper interpretation of certain Lease provisions. As the dispute ripened into litigation, each party lodged claims for declaratory judgment against the other. For its part, Florida Rock requests a declaration that "[t]he term of the Lease is too uncertain to be enforceable, so the Lease is void" (doc. 10, ¶ 15) or, alternatively, that "Florida Rock has a right to terminate the Lease on 120 days' notice beginning on the tenth anniversary of the Original Lease" (*id.* at 7). Likewise, Escambia Sand has filed a Counterclaim for Declaratory Judgment, seeking declarations "that the term of the subject Lease is 40 years, from September 14, 2005, through September 13, 2045" and "that Florida Rock does not possess the legal right to terminate the subject Lease by merely giving 120-days' notice, or any term or type of mere notice." (Doc. 13, ¶¶ 17-18.)[3]

---

[2]     The parties also executed a Second Amendment to Lease Agreement on or about April 23, 2008. (Doc. 10, ¶ 11 & Exh. A.) Both sides agree that this Second Amendment has no bearing on the claims presented in this lawsuit or the issues raised in the cross-motions for judgment on the pleadings; therefore, the undersigned does not address it. (*See* doc. 26, at 18 n.12 (Second Amendment "has nothing to do with the term and termination provisions in dispute, thus it is irrelevant to this action"); doc. 29, at 5 n.1 ("That second amendment does not contain any terms material to this action.").)

[3]     Federal subject matter jurisdiction is conferred by 28 U.S.C. § 1332. In particular, the pleadings reflect complete diversity of citizenship between the parties (Florida Rock being a Florida corporation with its principal place of business in Florida, and Escambia Sand being an Alabama corporation with its principal place of business in Alabama). Moreover, the amount in controversy vastly exceeds the jurisdictional threshold of $75,000 because the parties seek competing declarations that would either validate or negate Florida Rock's contractual obligation to pay seven-digit royalties to Escambia Sand. (Doc. 10, ¶ 3.) *See South Florida Wellness, Inc. v. Allstate Ins. Co.*, 745 F.3d 1312, 1315-16 (11th Cir. 2014) ("We have held that for amount in controversy purposes, the value of injunctive or declaratory relief is the value of the object of the litigation measured from the plaintiff's perspective.") (citation and internal marks omitted); *Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 807 (Continued)

Although the parties' briefs are lengthy, this litigation hinges on a narrowly circumscribed set of contract provisions relating to the term of the Lease and the circumstances under which it may be terminated. Paragraph 3 of the Original Lease was labeled "Term" and specified, "The term of this Agreement shall be for ten (10) years ('Term'), commencing on the date hereof … and ending on the tenth (10th) anniversary of the Commencement Date … unless sooner terminated or extended pursuant to this paragraph 3." (Doc. 30, Exh. A, ¶ 3.A.) Subparagraph B provided for early termination of the Original Lease as follows: "If, according to commonly recognized industry standards, the commercially mineable reserves of Construction Materials on the Leased Premises are exhausted prior to the Tenth Anniversary, TENANT may terminate this Agreement effective upon 120 days' written notice to LANDLORD." (*Id.*, ¶ 3.B.) Subparagraph C created a five-year extension period after the Tenth Anniversary, as follows:

> "If at the Tenth Anniversary commercially mineable reserves remain on the Leased Premises, then the Term shall automatically be extended (without any notice requirement) until the earliest of (i) the date on which the commercially mineable reserves on the Leased Premises have been exhausted, (ii) ***120 days after TENANT provides notice of termination of the Lease to LANDLORD***, or (iii) the fifteenth anniversary of the Commencement Date."

(*Id.*, ¶ 3.C. (emphasis added).) Subparagraph D provided for a comparable five-year extension of the Term at the Fifteenth Anniversary, until the earliest of the exhaustion of commercially mineable reserves, 120-days notice of termination by Florida Rock, or the Twentieth Anniversary. (*Id.*, ¶ 3.D.) By its express terms, the Original Lease was to be "construed and enforced in accordance with the laws of the State of Alabama." (*Id.*, ¶ 25.)

The parties executed the Amendment in June 2006 for the stated reasons (according to contractual recitals) that Escambia Sand was acquiring two additional parcels (known as the "Godwin Property" and the "Fuller Property") to add to the premises leased by Florida Rock. (Doc. 30, Exh. B, at 1.) The Amendment stated that, "[w]henever the terms of this First Amendment are inconsistent with the terms of the [Original] Lease, the terms of this First Amendment shall be deemed to supersede and amend the terms of the [Original] Lease." (Doc.

---

(11th Cir. 2003) ("When a plaintiff seeks injunctive or declaratory relief, the amount in controversy is the monetary value of the object of the litigation from the plaintiff's perspective.") (citation omitted).

30, Exh. B, ¶ 1.)  The centerpiece of the Amendment for purposes of this dispute is Paragraph 6, which was labeled "Extension of Term of Lease" and stated, in relevant part, as follows:

> "Upon the Effective Date of the [Amendment], the Term of the Lease shall be the number of years required to mine the estimated tons of commercially mineable reserves of sand and gravel on all the lands subject to the Lease … at a mining rate of 1,200,000 tons per year.

> "The Landlord and the Tenant agree that the lands covered by the original Lease … have estimated mineable reserves of 14.4 million tons; that the Godwin Property has estimated mineable reserves of 30.5 million tons, and that the Fuller Property has estimated mineable reserves of 2.6 million tons.[1]  Accordingly, ***the term of the Lease shall be 40 years from the original commencement date of September 14, 2005*** (47.5 million tons divided by 1,200,000 tons = 40 years).  Notwithstanding the foregoing, the Term of the Lease will terminate sooner if, according to commonly recognized industry standards, commercially mineable reserves of sand and gravel on the Leased Premises have been exhausted.  ***Upon the occurrence of such event, the Tenant may terminate the Term of the Lease upon 120 days written notice to Landlord.***

> "The extension of the Term of the Lease shall be effective as of the Effective Date …."

(Doc. 30, Exh. B, ¶ 6 (emphasis added).)

As set forth in the above-quoted passage, Paragraph 6 of the Amendment contained a footnote relating to the Fuller Property's estimated mineable reserves.  The text of that footnote reads, in its entirety, as follows:

> "The 'estimated mineable reserves of the Fuller Property' are based on an assumption by Escambia Sand & Gravel that 40 acres of the 55 acres of the Fuller Property are mineable (the remainder to accommodate borders, etc.) and that the 40 acres will yield 65,000 tons of mineable reserves per acre, for a total of 2.6 million tons of mineable reserves.  ***This estimate is subject to verification by Florida Rock and to an adjustment of the 'estimated mineable reserves of the Fuller Property' mutually agreeable to Florida Rock and Escambia Sand & Gravel.***"

(*Id.* (emphasis added).)  The Amendment concluded with a provision stating that "[e]xcept as expressly modified and amended herein, all the terms and provisions of the Contract shall remain in full force and effect."  (*Id.*, ¶ 10.)

The parties' dispute about the Lease is twofold.  First, Florida Rock contends that the Lease as a whole is unenforceable under Alabama law because it lacks a certain, definite end date.  For its part, Escambia Sand counters that the Lease provisions regarding term and end date are compliant with Alabama law.  Second, Florida Rock argues that the "Extension of Term of

Lease" provision found at Paragraph 6 of the Amendment did not modify, amend or supersede the portion of the Original Lease that gave Florida Rock the right of termination on 120 days' notice during the extension periods following the Tenth Anniversary. By contrast, Escambia Sand's position is that the Amendment superseded the Original Lease's clause allowing Florida Rock to unilaterally terminate the Lease, such that Florida Rock no longer has a right of termination without cause on 120 days' notice following the Tenth Anniversary. Such dueling arguments are the focus of the parties' cross-motions for judgment on the pleadings.

## II.    Analysis.

### A.    Legal Standard for Rule 12(c) Motions.

Both cross-motions are styled as motions for judgment on the pleadings pursuant to Rule 12(c), Fed.R.Civ.P. "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. District Attorney's Office for Escambia County,* 592 F.3d 1237, 1255 (11th Cir. 2010).[4] While relief under Rule 12(c) is "not lightly to be given," it is also true that "litigants should not be required to go through the full and elaborate process of trial of issues when there is a dominating legal principle governing liability which is dispositive of the case without the necessity of trial." *Roberson v. BancorpSouth Bank, Inc.*, 2013 WL 3153755, *1 n.1 (S.D. Ala. June 19, 2013) (citation omitted). Although they advocate for diametrically opposite rulings on the merits, plaintiff and defendant both opine that this case is ideally suited for disposition via the Rule 12(c) vehicle because there are no disputed material facts and judgment hinges solely on questions of Alabama law and judicial interpretation of unambiguous lease provisions. The Court agrees.

Generally speaking, courts "will not consider matters outside the pleadings when passing on a Rule 12(c) motion." *Horsley v. Feldt*, 304 F.3d 1125, 1136 n.6 (11th Cir. 2002). An exception is that courts "may also consider documents attached to the plaintiff's complaint if they are (1) central to the plaintiff's claim and (2) undisputed." *Bank of Camilla v. St. Paul*

---

[4]        *See also Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, --- F.3d ----, 2014 WL 1424432, *2 (11th Cir. Apr. 15, 2014) (same); *Palmer & Cay, Inc. v. Marsh & McLennan Companies, Inc.*, 404 F.3d 1297, 1303 (11th Cir. 2005) ("Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.") (citations omitted).

*Mercury Ins. Co.*, 531 Fed.Appx. 993, 994 (11th Cir. Sept. 25, 2013). Both the Original Lease and the Amendment are attached to the Amended Complaint as exhibits (*see* doc. 10, Exhs. 1 & 2); moreover, their contents are undisputed and are obviously central to the parties' competing claims for declaratory judgment. For those reasons, the Original Lease and the Amendment are properly considered for purposes of the parties' cross-motions for judgment on the pleadings.[5]

> ### B.    Whether the Lease is Rendered Unenforceable by an Uncertain Term.

A cornerstone of Florida Rock's position that it ought not be obligated to comply with the Lease for the next 31 years is that, under Alabama law, the Lease is too indefinite to qualify as a tenancy for years and is instead a mere tenancy at will. As Florida Rock frames it, the argument is that the Lease "is unenforceable due to its uncertain end date and that, as a result, a tenancy at will exists" between the parties. (Doc. 29, at 6.)[6]

---

[5]    In its briefs, Escambia Sand references various other documents, including a Memorandum of Lease dated September 14, 2005, a Memorandum of Amended Lease dated June 26, 2006, and Internet links relating to the sale of Florida Rock in 2007. (*See* doc. 26, at 22-25; doc. 32, at 1-3, 16-24.) These items will not be considered on Rule 12(c) review. The two Memoranda are attached to Escambia Sand's Answer and Counterclaim (doc. 13) as exhibits; however, Florida Rock challenges these exhibits' authenticity. (Doc. 29, at 14-15 n.4) Under the clear rule identified *supra*, exhibits may only be considered on a Rule 12(c) analysis if they are both central to the claims and undisputed. The subject Memoranda flunk the latter requirement; therefore, they are not properly considered here, regardless of whether (as Escambia Sand argues) Florida Rock's objection is made in bad faith or whether those exhibits would be admissible at trial under the Federal Rules of Evidence. Such considerations exceed the narrow parameters of Rule 12(c) review and are therefore inappropriate. This is so, even though "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Rule 10(c), Fed.R.Civ.P. After all, the Eleventh Circuit has explained that, notwithstanding Rule 10(c), a document attached to a pleading must be undisputed to be considered on Rule 12(c) review, because "[o]therwise, the conversion clause of Rule 12(c) would be too easily circumvented and disputed documents attached to an answer would have to be taken as true at the pleadings stage. The written instrument provision of Rule 10(c) does not require that." *Horsley*, 304 F.3d at 1135. As for Escambia Sand's citations to newspaper articles and websites concerning the Florida Rock / Vulcan Materials transaction, such information lies well beyond the pleadings, is not subject to any exception to the pleadings-only scope of Rule 12(c) review, and is therefore disregarded for purposes of this Order.

[6]    The distinction between a tenancy for years and a tenancy at will is of crucial importance. An estate "limited to endure for a definite and ascertained period, fixed in advance, is what is known as a term for years." *Waldrop v. Siebert*, 237 So.2d 493, 494 (Ala. 1970) (citations omitted). As one commentator explained, "during the term of an estate for years the tenancy may not be terminated by either party except for 'cause.'" David C. Skinner, *Alabama* (Continued)

Florida Rock's argument that the Lease is unenforceable rests entirely on the Alabama Supreme Court's decisions in *Linton Coal Co. v. South Cent. Resources, Inc.*, 590 So.2d 911 (Ala. 1991) and *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753 (Ala. 2006). Florida Rock interprets these cases as holding that a lease lacking a "single definite end date" is void and unenforceable under Alabama law. Florida Rock reasons that, notwithstanding the 40-year term stated on the face of the Amendment, the Lease does not have such a "single definite end date" because (i) it is subject to a right of early termination if commercially mineable reserves are exhausted prior to that date, and (ii) footnote 1 to the "Extension of Term of Lease" clause of the Amendment creates ambiguity as to the actual term of the Lease. Escambia Sand disagrees, and maintains that the Lease satisfies Alabama's definiteness requirement.

### *1. The* Linton Coal *and* Drummond *Holdings*.

The appropriate starting point of the analysis is to strip away the rhetoric and examine what *Linton Coal* and *Drummond* say and what they do not say. In *Linton Coal*, the parties entered into a lease agreement in 1974 to allow the lessee to mine and remove coal. That lease had an initial term of five years, after which the lessee had an option to extend it for successive five-year terms "so long as there is recoverable coal remaining in the lands leased hereby." *Linton Coal*, 590 So.2d at 911. Fourteen years later, the lessor refused to allow the lessee to continue mining the property, so the lessee sued. The lessor argued that "the lease is void because it does not contain a 'term certain,' or definite ending date." *Id.* at 912. The Alabama Supreme Court agreed, reasoning that the provision allowing for renewal "so long as there is recoverable coal remaining" was deficient because "the date of that occurrence is entirely uncertain." *Id.* On that basis, the *Linton Coal* Court held "that the term of the lease is so incapable of ascertainment that it renders the lease void as a tenancy for years and a tenancy at

---

*Residential, Commercial & Mineral Lease Law* § 6.2(a) (1997). By contrast, "[w]here a lease is for an indefinite and uncertain term, there is no valid lease for a term of years, but an estate at will is thereby created." *Melson v. Cook*, 545 So.2d 796 (Ala.Civ.App. 1989) (citation and internal quotation marks omitted). "A tenant at will is governed by the common law and is thus entitled to no more than reasonable notice to quit." *Id.* So, if the Lease at issue here creates a tenancy at will, then Florida Rock may terminate it without cause on reasonable notice, rather than remaining bound by the Lease through the year 2045 (as it would be under a tenancy for years) absent cause for termination.

will is created," such that the lessor was entitled to an order requiring the lessee to vacate the premises. *Id.*[7]

Similarly, in *Drummond* (the only published opinion ever to cite *Linton Coal* in the intervening 23 years), the parties agreed to extend the term of an underlying lease "to the extent necessary to complete mining the strippable coal," without providing a "date certain" for completion of such mining activities. *Drummond*, 962 So.2d at 774. The Alabama Supreme Court found that that this "will-extend clause is too indefinite to be enforceable." *Id.* Similarly, the parties agreed that the lessor would lease to the lessee the right to strip mine the lessor's "remaining strippable coal," but "did not specify effective dates or termination dates," such that this clause was "inoperative without further action by the parties." *Id.* at 775. In deeming these clauses void for indefiniteness, the *Drummond* Court relied on *Linton Coal*. *Drummond* emphasized that these provisions "have no definite end date" and that "it is impossible to determine when Drummond would have mined all the strippable coal … made the subject of the will-extend clause; it is also impossible to determine from a reading of the will-lease clause the beginning and ending dates of the leases contemplated therein." *Id.* at 776.

In the case at bar, the Lease specifies that "the term of the Lease shall be 40 years from the original commencement date of September 14, 2005." (Doc. 30, Exh. B, ¶ 6.) On its face, this language appears to satisfy the *Linton Coal / Drummond* requirement that the lease contain a "definite ending date." In its Rule 12(c) Motion, however, Florida Rock insists that the term of the Lease is incapable of ascertainment, such that it is a tenancy at will (rather than a tenancy for years), because of the independent effects of an exhaustion-of-reserves clause and a footnote pertaining to the Fuller Property. Each of these analytically distinct arguments will be addressed in turn.

### 2. The Exhaustion-of-Reserves Clause.

Florida Rock's position is that the 40-year term stated on the face of the Lease lacks certainty because of the following contract language: "Notwithstanding the foregoing, the Term

---

[7]     In so concluding, the *Linton Coal* Court followed *Womack v. Hyche*, 503 So.2d 832 (Ala. 1987). In *Womack*, the Alabama Supreme Court declared void a lease with a clause allowing renewal for one-year terms in perpetuity "as long as the camp has been run as a business for a profit." *Id.* at 835. *Womack* reasoned that the lease "had no certain ending, thus rendering the lease void as a tenancy for years" and creating "a tenancy at will." *Id.* at 836.

of the Lease will terminate sooner if, according to commonly recognized industry standards, commercially mineable reserves of sand and gravel on the Leased Premises have been exhausted. Upon the occurrence of such event, the Tenant may terminate the Term of the Lease upon 120 days written notice to Landlord." (Doc. 30, Exh. B, ¶ 6 (hereinafter, the "Exhaustion-of-Reserves Clause").) In other words, the 40-year specified Lease term is subject to early termination by Florida Rock on 120 days' notice if it mines all the sand and gravel from the leased property before that 40-year term expires.[8] Florida Rock seizes on this Exhaustion-of-Reserves Clause, arguing that it creates a "multiple-choice end-date scheme" and thereby contravenes the *Linton Coal / Drummond* principle "that a single certain end date is required for a mining lease to be enforceable under Alabama law." (Doc. 29, at 12 & n.2.) On that basis, Florida Rock maintains that the Lease's end date is uncertain, that *Linton Coal* and *Drummond* mandate that the Lease be declared unenforceable, and that this Court should declare the Lease to create nothing more than a tenancy at will.

The Court finds Florida Rock's "definite ending date" argument relating to the Exhaustion-of-Reserves Clause to be unpersuasive for at least four reasons. First, Florida Rock has overplayed its hand with regard to *Linton Coal* and *Drummond*, which it lauds as "crystal-clear, on-point Alabama law" (doc. 29, at 10) whose "unambiguous words" and "controlling" holdings (doc. 33, at 3-4) provide a "clear rule" (*id.* at 9) voiding the Lease. But neither of those cases involved a lease in which the parties agreed to a definite ending date, subject to early termination upon occurrence of a special condition. To the contrary, the lease in *Linton Coal* could be renewed "so long as there is recoverable coal remaining in the lands leased hereby," and the *Drummond* parties agreed to extend their lease "to the extent necessary to complete mining the strippable coal." Neither the *Linton Coal* lease nor the *Drummond* agreement had a firm, certain termination date; rather, the ending date of the lease (as extended or renewed) was left entirely open-ended.

---

[8] Plainly, the Exhaustion-of-Reserves Clause was included in the Lease for Florida Rock's protection. Without it, Florida Rock would have been obligated to continue making large monthly royalty payments to Escambia Sand through 2045 even if it had exhausted all sand and gravel from the leased premises decades earlier. Thus, the Exhaustion-of-Reserves Clause provided a valuable safety valve to excuse further payments by Florida Rock and terminate the Lease early if the sand and gravel ran out sooner than expected.

By contrast, Florida Rock and Escambia Sand agreed to a specific, definite 40-year term, subject to early termination if the sand and gravel reserves were exhausted from the leased premises sooner. That distinction looms large. The Alabama Supreme Court did not confront this scenario in either *Linton Coal* or *Drummond*, nor did it intimate in these decisions how it would apply the "term certain" rule to a fixed-term lease with an early-termination clause, as opposed to an expired lease with an open-ended, hopelessly indefinite extension/renewal provision.[9] Nothing in the holdings of *Linton Coal* or *Drummond* leads inexorably to the conclusion that a tenancy of years is necessarily reduced to a tenancy at will if the lease contains a clause allowing for early termination at a party's option upon occurrence of a specified contingency. *Linton Coal* and *Drummond* thus do not contain the "controlling" and "unambiguous rule" that Florida Rock says they do.[10]

---

[9]    To be sure, had Florida Rock and Escambia Sand entered into a lease that did not include a specific termination date, but stated only that the lease would remain in effect (or would be extended) "until commercially mineable reserves of sand and gravel on the Leased Premises have been exhausted," then Florida Rock's argument would resonate. In that event, *Linton Coal* and *Drummond* would control because they hold that the term of such a lease is "so incapable of ascertainment that it renders the lease void as a tenancy for years." *Linton Coal*, 590 So.2d at 912. However, *Linton Coal* and *Drummond* are silent as to enforceability where the parties enter into a lease for a definite period of years but provide for early termination under certain enumerated contingencies. Therefore, Florida Rock's insistence that those two decisions are "on-point" and "controlling" misses the mark.

[10]    In a footnote, Florida Rock allows for the possibility of "uncertainty" as to the applicable rule under Alabama law, and urges the Court "to certify the question of controlling state law to the Supreme Court of Alabama" in that event. (Doc. 29, at 12 n.2.) "[C]ertification of state law questions is a matter of discretion." *Royal Capital Development, LLC v. Maryland Cas. Co.*, 659 F.3d 1050, 1054 (11th Cir. 2011); *see also Lehman Bros. v. Schein*, 416 U.S. 386, 390–91, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) ("We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory …. Its use in a given case rests in the sound discretion of the federal court."); *Jennings v. BIC Corp.*, 181 F.3d 1250, 1254 n.2 (11th Cir. 1999) ("Certification of a state law question is a matter of discretion," and is "based on a number of factors, the most important of which are the closeness of the question and the existence of sufficient sources of state law.") (citations and internal marks omitted). Here, the Court exercises its discretion not to certify the question to the Alabama Supreme Court of whether a fixed-term lease is void for indefiniteness if it gives a party the option of early termination upon occurrence of a specified contingency. In doing so, the Court is persuaded that existing sources of state law provide sufficient and significant guidance on this point, and the question does not appear to be a close one for the reasons set forth *infra*. Under the circumstances, the undersigned's resolution of this question of Alabama law is not (Continued)

-10-

Second, in analogous settings, Alabama law provides that early-termination provisions do not transform leases for definite terms into tenancies at will. "Generally speaking, it seems well settled that an option, given a lessee to terminate the lease after a specified time of notice, cannot, under any circumstances, have the effect of creating a tenancy at will." *Marcrum v. Embry*, 282 So.2d 49, 52 (Ala. 1973) (citations omitted). Indeed, the Alabama Supreme Court has opined that "a lease for a definite term is not converted into a tenancy at will by the fact that an option to surrender it before the expiration of the term is conferred upon the lessee …." *Id.* (citation omitted). The Exhaustion-of-Reserves Clause was not self-executing; rather, it effectively conferred on Florida Rock (as lessee) the option to terminate the Lease on 120-days' written notice if mineable reserves were exhausted during the 40-year term. By all appearances, then, the general principles of law articulated so definitively in *Marcrum* would seem fatal to Florida Rock's argument that the Exhaustion-of-Reserves Clause transformed what otherwise would have been a lease for a definite term into a tenancy at will.

Third, the above recitation of Alabama law appears both rooted in and consistent with the observations and conclusions reached by numerous commentators, treatises and tribunals in other jurisdictions. *See, e.g.*, 1 *Tiffany Real Property* § 159 (3d ed.) (discussing options for a lessee "to terminate his tenancy at any time," and opining "[t]hat a lease in terms creating an estate for years contains such an option in the lessee does not render the latter a tenant at will merely"); 52 C.J.S. *Landlord & Tenant* § 27 ("Where a term for a fixed period is created by a lease, a provision for the termination of the lease on an event that may or may not happen before the expiration of the period specified will not prevent the creation of a valid term for years."). Sometimes, these authorities are couched in the language of "special limitations." "The term 'special limitation' denotes that part of the language of a conveyance which causes the created interest automatically to expire upon the occurrence of a stated event, and thus provides for a terminability in addition to that normally characteristic of such interest." *Restatement (First) of Property*, § 23. The existence of such a "special limitation" does not reduce an estate of years to

---

tantamount to an unnecessary *Erie* guess, but is instead appropriate. *See generally State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011) ("Where, as here, we find no [state] Supreme Court decision directly on point, we must anticipate how the [state] Supreme Court would decide this case.").

a mere tenancy at will.[11]  Additionally, "[i]t is possible for the tenant, like the landlord, to have the power to bring an estate for years to an end."  2 *Powell on Real Property*, § 16.03[7][c].  This is often done via condition subsequent.  "A tenancy terminable at the option of one of the parties to the lease on the occurrence of an event traditionally has been referred to as a term of years subject to a condition subsequent."  *Restatement (Second) of Property*, § 1.7, comment e.  That is precisely what the Exhaustion-of-Reserves Clause accomplishes; therefore, under this line of treatises, Restatements and so on, the Exhaustion-of-Remedies Clause cannot properly be viewed as destroying the tenancy for years created by the Lease and replacing it with a tenancy at will.

Fourth, even setting aside the foregoing authorities and considerations, the rule urged by Florida Rock would be unfair and unreasonable.  Escambia Sand has presented numerous citations to support the proposition that exhaustion-of-reserves clauses are commonplace in the mining industry.  (*See* doc. 32, at 7-11.)  Florida Rock does not quarrel with that premise.  (Doc. 33, at 7-8.)  By all appearances, these clauses are routinely included in mining leases to protect the lessee from remaining "on the hook" for royalty payments for the entirety of a specified term of years, even if the leased premises have been fully depleted in the interim.  Yet Florida Rock urges this Court to conclude that, in Alabama, such clauses automatically, always, and in every case convert a tenancy of years into a tenancy at will.  In that scenario, lessors would be loathe to enter into mining leases containing exhaustion-of-reserves clauses because such leases would necessarily be tenancies at will as to which the lessee could walk away at any time without cause.  Of course, lessees would be reluctant to enter into mining leases that lacked exhaustion-

_____

[11]  *See, e.g., Commissioner of Internal Revenue v. Philadelphia Coke Co.*, 130 F.2d 87, 89 (3rd Cir. 1942) ("It is not an uncommon practice to subject estates for years to 'special limitations' whereby an estate may be terminated before the expiration of its definite term. … Yet, in no instance will it appear that the definite term of the estate is lessened by the presence of a possibility of earlier defeasibility."); *Restatement (First) of Property*, § 19, comment c ("An estate for years can be created subject to a special limitation …, a condition subsequent …, an executory limitation … or a combination of these restrictions."); 2 Richard R. Powell, *Powell on Real Property* § 16.03[4][b] ("[A] term of years lease that specifies a calendar ending but that provides for earlier defeasibility by special limitation, condition subsequent or executory interest is valid.  Thus, a lease 'for fifty years or until the war ends' would establish a term of years determinable, and would be valid.") (footnote omitted); 1 *Tiffany Real Property* § 148 (3d ed.) ("The tenant's estate for years … may be subject to a 'special limitation,' or, as it is sometimes called, a 'conditional limitation,' by which such estate may come to an end before the regular end of the term upon the happening of some contingency.").

of-reserves clauses, for the reasons identified *supra*. The net effect, then, of the regime championed by Florida Rock is that mining leases in Alabama would be chilled because either the mine owner or the mining company would lack even basic protections. If the lease contained an exhaustion-of-reserves clause, then the mine owner would lack contractual assurance that the mining company would perform for any meaningful length of time (given the lease's at-will nature). If it did not contain such a clause, then the mining company would bear responsibility for making royalty payments through the entire tenancy of years, even if the mineable materials were exhausted in the interim. Either way, the lease would be imbalanced and commercially unreasonable to one side or the other. The Court finds it highly improbable that the Alabama Supreme Court would adopt such an unreasonable rule, create a hostile climate for mining leases in the State of Alabama, and do so in a manner that appears out of step with both national authorities and extant Alabama case law.[12]

For all of the foregoing reasons, individually and collectively, the Court holds that the mere existence of the Exhaustion-of-Reserves Clause does not render the Lease for a specified term void for indefiniteness under Alabama law, nor does it convert the tenancy for years into a tenancy at will.

### 3. *The Fuller Property Footnote.*

Florida Rock also challenges the Lease as void for indefiniteness for a separate reason. In particular, Florida Rock contends that the Lease's 40-year term is illusory because a footnote in the Amendment "mak[es] clear that the 40-year calculation was a 'best guess' at the time that was subject to change." (Doc. 29, at 8.) Paragraph 6 of the Amendment states that "the Term of the Lease shall be the number of years required to mine the estimated tons of commercially mineable reserves of sand and gravel … at a mining rate of 1,200,000 tons per year." (Doc. 30, Exh. B, ¶ 6.) Further, that Paragraph recites that the three tracts of land encompassed by the

---

[12]    Another, related logical defect with Florida Rock's position is this: If an Exhaustion-of-Reserves Clause is incompatible with a tenancy for years, then any clause allowing for early termination of a lease under any circumstances (*i.e.*, non-performance by the other side, natural disaster, acts of God, etc.) would transform a mining lease for a fixed term into a mere tenancy at will. The result would be that all, or virtually all, mining leases in Alabama would be unenforceable as tenancies for years. The Alabama Supreme Court could not have intended such a broad, sweeping effect of *Linton Coal* and *Drummond*, and (in the undersigned's view) would not interpret those authorities in such a debilitating manner.

Lease have estimated mineable reserves of 14.4 million tons, 30.5 million tons, and 2.6 million tons, respectively, which equates to 40 years under the specified formula (*i.e.*, 47.5 million tons of mineable reserves divided by 1.2 million tons/year). (*Id.*) After setting forth those details, Paragraph 6 definitively provides, "[t]he term of the Lease shall be 40 years from the original commencement date of September 14, 2005." (*Id.*) So far, so good.

The sticking point, according to Florida Rock, is the footnote accompanying the estimate of 2.6 million tons of mineable reserves for the Fuller Property.[13] That footnote (the "Fuller Property Footnote") recites Escambia Sand's assumptions in reaching that 2.6 million-ton estimate (*i.e.*, that 40 of the 55 acres are mineable, and that there are 65,000 tons of mineable reserves per acre), then states as follows: "This estimate is subject to verification by Florida Rock and to an adjustment of the 'estimated mineable reserves of the Fuller Property' mutually agreeable to Florida Rock and Escambia Sand & Gravel." (*Id.*) In briefing the Rule 12(c) Motions, Florida Rock seizes on this verification provision and argues that because of it, "there is no certainty that the term of the Amended Lease will end on the fortieth anniversary. Instead, the end date was left up in the air." (Doc. 29, at 9.) Florida Rock's position is that the Fuller Property Footnote taints the entire Lease, causes it to run afoul of the rule in *Linton Coal* and *Drummond*, and transforms the Lease into a mere tenancy at will.

Once again, plaintiff places more weight on *Linton Coal / Drummond* than those decisions can reasonably bear. Florida Rock insists that the Fuller Property Footnote "does not satisfy ***the exacting certainty standard for an end date*** established in *Linton Coal* and *Drummond*." (Doc. 29, at 9 (emphasis added).) But nowhere in those decisions does the Alabama Supreme Court announce an "exacting certainty standard." As discussed *supra*, what those cases hold is that when a lease fails to specify any ending date at all (but instead pegs termination of the lease solely to something as amorphous, uncertain and unknown as the exhaustion of mineable reserves or the cessation of a camp being run as a for-profit business), it is unenforceable as a tenancy for years. The test is whether "the term of the lease is so incapable of ascertainment that it renders the lease void as a tenancy for years." *Linton Coal*, 590 So.2d at

---

[13]    For whatever reason, the Amendment did not contain similar footnotes for the other two parcels, even though the estimated mineable reserves on those tracts (14.4 million tons and 30.5 million tons) dwarfed the 2.6-million ton estimate for the Fuller Property.

912. Here, not only is the term of the Lease capable of ascertainment, but the Lease expressly provides that "the term of the Lease shall be 40 years." (Doc. 30, Exh. B, ¶ 6.) There is no mystery, no guesswork, no ambiguity as to what the parties agreed the term of the Lease would be.

So what, then, of the Fuller Property Footnote, and the accompanying text in Paragraph 6 concerning estimated mineable reserves and the formula used to compute that 40-year term? The Court does not adopt Escambia Sand's proposal that such language may be summarily jettisoned as "mere surplusage." (Doc. 32, at 13-14.) To the contrary, those provisions are operable. They set forth a framework for adjusting the Lease term if the estimated mineable reserves of the Fuller Property were later found to diverge from Escambia Sand's assumptions. But any such "adjustment" could only be made if "mutually agreeable" to the parties. (Doc. 30, Exh. B, ¶ 6.) That agreement would necessarily be an amendment to the Lease. What the parties accomplished, then, via the Fuller Property Footnote was not a disruption of the term of the Lease. (Again, that term was unambiguously prescribed as "40 years from the original commencement date.") Instead, the Fuller Property Footnote and associated text in Paragraph 6 set forth the agreed-upon infrastructure by which a future Lease amendment might be made if the Fuller Property's estimated mineable reserves were found to be greater or less than 2.6 million tons.[14] The term of the Lease itself remained intact at 40 years, and was in no way undermined, compromised or invalidated by the Fuller Property Footnote.

---

[14] A concrete example might clarify the footnote's function. Suppose that neither the Fuller Property Footnote nor the Paragraph 6 language relating to the formula for calculating the lease term existed. Suppose also that after the Amendment was signed, Florida Rock determined that the estimated mineable reserves at the Fuller Property were just 1.0 million tons, not 2.6 million tons. Without that language, the parties would have no guidance, no formula, and no procedure for how to amend the Lease to reflect that reduced estimate. All of this would have to be negotiated anew. Armed with the Fuller Property Footnote and the Paragraph 6 formula, however, the parties created a clear framework for such a future modification of the Agreement, if necessary. In the example provided, then, once the parties agreed that the estimated mineable reserves at the Fuller Property were just 1.0 million terms, then it would be a simple matter to use their existing formula to amend the Lease term as follows: 14.4 million tons + 30.5 million tons + 1.0 million tons = 45.9 million tons divided by 1.2 million tons / year = 38.25 years as the amended term of the Lease. Such an amendment could be readily achieved using the groundwork the parties had previously established and documented in the Lease.

Stated differently, absent some further agreement by the parties (*i.e.*, another amendment to the Lease), the term of the Lease was, is, and always would be 40 years from the specified commencement date of September 14, 2005.[15]  To be sure, the Lease documents certain parameters under which a further amendment might be achieved to modify that 40-year term.  By the clear terms of the Fuller Property Footnote, however, no such amendment would occur without a subsequent agreement by the parties (*i.e.*, adjustment would occur only as "mutually agreeable to Florida Rock and Escambia Sand").  What this means is that the parties agreed to a fixed, definite 40-year term subject to modification upon future agreement / amendment.  Of course, parties are always free to modify or amend the terms of their contract.  *See, e.g., McLemore v. Hyundai Motor Mfg. Alabama, LLC*, 7 So.3d 318, 332 (Ala. 2008) ("[p]arties may modify the terms of their agreement"); *Jacks v. Madison County*, 741 So.2d 429, 432 (Ala.Civ.App. 1999) ("[i]t is well settled that contracting parties are free to modify their contract by mutual assent").  That the Fuller Property Footnote and its surrounding context provided some guidance and a framework to assist with any modification that the parties might later agree to make as to the term of the Lease in no way rendered the stated 40-year term ambiguous, uncertain, illusory, or so incapable of ascertainment as to void the Lease.

Simply put, the Lease taken as a whole unambiguously expressed that its term would run 40 years from the September 2005 commencement date.  None of the surrounding language highlighted by Florida Rock constitutes eradication, equivocation, or modification of that clear specified lease term.  As such, the Lease does have a definite end date, and comports with the Alabama rule set forth in *Linton Coal* and *Drummond*.  The Court therefore finds as a matter of law that the subject Lease is not one whose term "is so incapable of ascertainment that it renders the lease void as a tenancy for years and a tenancy at will is created." *Linton Coal*, 590 So.2d at

---

[15]        This is not a case in which the parties failed to specify a term of the Lease, but merely recited a formula from which such term might be discerned.  Nor is this a case in which the parties purported to fix a lease term, then provided that the term would automatically slide forward or backward based on information obtained in the future.  To the contrary, they agreed that "the term of the Lease shall be 40 years," and that modification of that term may occur as "mutually agreeable" to the parties (*i.e.*, on amendment to the Lease).  As such, the Lease term here bears no resemblance to those deemed uncertain and void for indefiniteness by the Alabama Supreme Court in *Linton Coal* and *Drummond*.

912. Accordingly, Florida Rock is not entitled to a declaration that the Lease is unenforceable and void under *Linton Coal / Drummond*.

### C. Whether Florida Rock May Terminate the Lease on 120 Days' Notice.

In the alternative to its void-for-indefiniteness argument, Florida Rock seeks judgment on the pleadings on a matter of contract interpretation. Specifically, Florida Rock requests entry of "a declaratory judgment that Florida Rock has the option to terminate the Amended Lease beginning at the tenth anniversary of the Original Lease." (Doc. 29, at 17.) This argument hinges on the interplay between the Original Lease executed in September 2005 and the Amendment executed in June 2006.

Before delving into the minutiae of the parties' competing takes on the relationship between the "Term" clause set forth in Paragraph 3 of the Original Lease and the "Extension of Term of Lease" provisions of Paragraph 6 of the Amendment, it is appropriate to recite applicable principles of Alabama law governing interpretation of these documents.

As an initial matter, there can be no question that "[l]ease agreements are contracts and … the general principles of contract construction apply in ascertaining the scope and meaning of a lease agreement." *N & L Enterprises, LLC v. Lioce Properties, LLP*, 51 So.3d 273, 279 (Ala. 2010) (citations omitted). "[A] court in seeking to ascertain the intention of the parties in construing a contract, will consider the contract as a whole, although the immediate object of the inquiry is the meaning of a particular clause. Further, a contract must be construed as a whole and, whenever possible, effect must be given to all its parts." *Gulf Coast Realty Co. v. Professional Real Estate Partners, Inc.*, 926 So.2d 992, 1005 (Ala. 2005) (citations omitted). "General contract law requires a court to enforce an unambiguous lawful contract, as it is written." *Public Bldg. Authority of the City of Huntsville v. St. Paul Fire & Marine Ins. Co.*, 80 So.3d 171, 180 (Ala. 2010) (citation and internal quotation marks omitted); *see also Gulf Coast Realty*, 926 So.2d at 1005 (if contract is unambiguous, "then the court will presume that the parties intended what they stated and will enforce the contract as written") (citation omitted); *Byrd Companies, Inc. v. Birmingham Trust Nat'l Bank*, 482 So.2d 247, 251 (Ala. 1985) ("in the absence of an ambiguity, we may not interpret a lease, but must take it as it is written") (citation and internal quotation marks omitted). "As long as the contractual terms are clear and unambiguous, questions of their legal effect are questions of law." *SouthTrust Bank v. Copeland One, LLC*, 886 So.2d 38, 41 (Ala. 2003) (citations omitted).

Of course, "[t]he decision whether a contract provision is or is not ambiguous is a question of law for the trial court." *Food Service Distributors, Inc. v. Barber*, 429 So.2d 1025, 1028 (Ala. 1983); *see also Interstate Investment Corp. v. Rose Care, Inc.*, 631 So.2d 836, 839 (Ala. 1993) ("Whether the lease is ambiguous was a question of law for the trial court."). "A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning." *FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.*, 914 So.2d 344, 357 (Ala. 2005); *see also Kelmor, LLC v. Alabama Dynamics, Inc.*, 20 So.3d 783, 790 (Ala. 2009) ("An instrument is unambiguous if only one reasonable meaning clearly emerges.") (citations and internal quotation marks omitted). "[J]ust because the parties allege different constructions of an agreement, it does not necessarily mean that the agreement is ambiguous." *McLemore*, 7 So.3d at 328 (citation omitted). For purposes of such analysis, "[i]t is well settled that the words of a contract are to be given their ordinary meaning, and the intention of the parties is to be derived from the provisions of the contract itself." *N & L Enterprises*, 51 So.3d at 279 (citation omitted). With regard to contractual amendments, Alabama law provides that "parties are free to modify agreements, and if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail." *Cavalier Mfg., Inc. v. Clarke*, 862 So.2d 634, 641 (Ala. 2003). These principles inform and govern the Court's analysis of the subject Lease documents.

As noted, Florida Rock's contract interpretation argument depends on the interaction between the Original Lease and the Amendment. Paragraph 3 of the Original Lease specified that "[t]he term of this Agreement shall be for ten (10) years," but that the lease term would be automatically extended if commercially mineable reserves remained as of the tenth anniversary of the commencement date. (Doc. 30, Exh. A, ¶¶ 3.A., 3.C.) In that event, the Original Lease provided, the term would be extended "until the earliest of (i) the date on which the commercially mineable reserves on the Leased Premises have been exhausted, (ii) ***120 days after TENANT provides notice of termination of the Lease to LANDLORD***, or (iii) the fifteenth anniversary of the Commencement Date." (*Id.*, ¶ 3.C. (emphasis added).) Thus, the Original Lease provided that the lease term of ten years would be extended for another five years, so long

as commercially mineable reserves remained, subject to Florida Rock's right to terminate the lease without cause during the extension period on 120-days' written notice.[16]

By contrast, Paragraph 6 of the Amendment dispensed with the ten-year initial term and the five-year extension periods, as established by the Original Lease. Instead, the Amendment provided that "the term of the Lease shall be 40 years from the original commencement date" (doc. 30, Exh. B, ¶ 6), with no provision for extensions following that initial term. Paragraph 6 of the Amendment recited only one circumstance in which the Lease could be terminated prior to September 2045, to-wit: "[T]he Term of the Lease will terminate sooner if … commercially mineable reserves of sand and gravel on the Leased Premises have been exhausted. Upon the occurrence of such event, the Tenant may terminate the Term of the Lease upon 120 days written notice to Landlord." (Doc. 30, Exh. B, ¶ 6.) Beyond the Exhaustion-of-Reserves Clause, the Amendment said nothing about whether Florida Rock could terminate the Lease without cause on 120 days' written notice.

The critical question for purposes of the dueling Motions for Judgment on the Pleadings is how Paragraph 3 of the Original Lease and Paragraph 6 of the Amendment are to be read together. Escambia Sand argues that the termination provisions of the Original Lease were extinguished by the Amendment, and that the Lease now "provides *only one* method for terminating the lease prior to September 13, 2045" (doc. 26, at 19), namely, Florida Rock giving 120-days' written notice after commercially mineable reserves are exhausted. In stark disagreement with Escambia Sand's construction, Florida Rock insists that its right in the Original Lease to terminate the Lease without cause on 120 days' written notice after the tenth anniversary remains in play after the Amendment.

After careful consideration of the parties' respective positions, and with due regard for Alabama principles of contract construction, the Court concludes as a matter of law and unambiguous contract interpretation that Escambia Sand has the more compelling argument. Here is why: Paragraph 1 of the Amendment provides that "[w]henever the terms of this First Amendment are inconsistent with the terms of the [Original] Lease, the terms of this First

---

[16] A similar provision in the Original Lease provided for a second extension from the fifteenth anniversary of the commencement date until the twentieth anniversary, so long as commercially mineable reserves remained, and again subject to Florida Rock's right to terminate without cause on 120 days' notice during this second extension period.

Amendment shall be deemed to supersede and amend the terms of the [Original] Lease." (Doc. 30, Exh. B, ¶ 1.) Under any reasonable construction, the "Term" provision set forth in Paragraph 3 of the Original Lease is inconsistent with the "Extension of Term of Lease" provision set forth in Paragraph 6 of the Amendment. After all, the Original Lease set forth a lease term of just ten years, subject to two five-year extensions if commercially mineable reserves remained and if Florida Rock did not exercise a unilateral right of termination during the extension periods. But the Amendment set forth a lease term of 40 years, with no extensions, and provided for early termination only in the event that commercially mineable reserves were exhausted. Paragraph 3 of the Original Lease and Paragraph 6 of the Amendment are transparently, irreconcilably inconsistent with each other; therefore, under the clear directive of Paragraph 1 of the Amendment, Paragraph 6 of the Amendment "supersede[s] and amend[s]" the corresponding Paragraph 3 of the Original Lease. Under that construction, Florida Rock's unilateral right of termination during the extension periods (as set forth in the Original Lease) has been superseded by the Amendment and is therefore of no further force and effect.

Florida Rock's counterargument – that its unilateral right of termination during the post-tenth anniversary extension period survived the Amendment – withers under scrutiny. Florida Rock invokes Paragraph 10 of the Amendment, which reads, "Except as expressly modified and amended herein, all the terms and provisions of the [Original Lease] shall remain in full force and effect." (Doc. 30, Exh. B, ¶ 10.) According to Florida Rock, the Amendment did not "expressly modify and amend" the portion of the Original Lease affording Florida Rock unilateral termination rights during an extension period. (Doc. 29, at 18-19.)[17] Sure it did. The Original Lease established a ten-year lease term, with two five-year extensions that could be

---

[17] Implicit in Florida Rock's argument is the notion that the Amendment could not "expressly modify and amend" the Original Lease unless it used some magic language. Of course, nothing in Paragraph 10 of the Amendment would require the use of any particular formulation or phraseology. Moreover, under any reasonable reading, Paragraph 6 of the Amendment "expressly modified and amended" the entirety of Paragraph 3 of the Original Lease, or at least all portions of Paragraph 3 relating to extension periods of the lease term. After all, the Amendment fundamentally did away with those extension periods altogether, so it must have also done away with the provisions of the Original Lease outlining termination triggers tied to those extension periods. The Court therefore rejects Florida Rock's contention that, absent language specifically expressing the parties' desire to abrogate the unilateral-termination clause of the Original Lease, such a clause must remain in full force and effect after the Amendment.

terminated upon the occurrence of certain enumerated events.  The Amendment provided for a 40-year lease term with no extensions, thereby expressly modifying and amending all Original Lease provisions relating to term of lease and extensions of lease (which would include methods of terminating the lease during such extension periods).  Under any reasonable, common-sense reading, the Amendment "expressly modified and amended" the entire "Term" provision of the Original Lease, such that by operation of Paragraph 10 that provision is no longer in effect.

Another way to make the point is this:  By the clear terms of the Original Lease, the unilateral termination provision only has meaning, purpose and application in the context of extension periods between the tenth and fifteenth anniversaries, and between the fifteenth and twentieth anniversaries.  Again, the Original Lease provides, "If at the Tenth Anniversary commercially mineable reserves remain on the Leased Premises, then the Term shall automatically be extended … until the earliest of … 120 days after TENANT provides notice of termination of the Lease to LANDLORD."  (Doc. 30, Exh. A, ¶ 3.C.)  Pursuant to the Amendment, however, there was no longer a ten-year term with two five-year extensions; rather, there was a singular 40-year term.  With that Amendment, the context that gave the termination-without-cause provision its *raison d'etre* had evaporated.  In other words, provisions in the Original Lease outlining methods by which the Lease could be terminated during the five-year extension periods were inconsistent with, expressly amended by, and abrogated by an Amendment that excised those extension periods.  The provision of the Amendment that eliminated the extension periods necessarily eliminated all provisions from the Original Lease concerning triggers for termination of the (now-nonexistent) extension periods.  Logic and common sense dictate that contractual terms related solely to termination of an agreement during an extension period cannot survive an amendment that extinguishes the extension period altogether.[18]

---

[18]     Florida Rock insists that "[i]f [the parties] had intended to remove that option, they could easily have done so."  (Doc. 29, at 19.)  But everyone agrees that, pursuant to the Amendment, the extension periods between the tenth and fifteenth anniversaries, and between the fifteenth and twentieth anniversaries, were erased.  So why would the parties have needed to make any separate statements in the Amendment sweeping aside termination triggers tied solely to those now-eliminated extension periods?  Such an expression would have been nonsensical in the overall framework of the Amendment, and unhelpful as an expression of the parties' intent.

Florida Rock offers another rationale that fares no better. It argues, "Under the Original Lease, the term of the lease was twenty years unless commercially mineable reserves were exhausted or unless Florida Rock exercised its termination right on 120 days' notice after the tenth anniversary." (Doc. 29, at 20.)[19] According to Florida Rock, merely adjusting the Term from 20 years to 40 years should not have affected its termination right after the tenth anniversary. But this is a material distortion of the facts. The Original Lease did not provide for a 20-year term. It provided for a ten-year term, with the possibility of two five-year extensions. Florida Rock's unilateral termination right applied only to the extension periods, not to the initial term. When the Amendment transformed the 10-year term to a 40-year term, it necessarily obliterated the extension periods between years 10 and 20 and, with them, Florida Rock's unilateral right of termination during such extension periods.[20] Florida Rock cannot rewrite critically important provisions of the Original Lease to suit its Rule 12(c) arguments. This Court must rule on the Lease documents as they actually are, not on the way one litigant now wishes they had been structured.

---

[19] Florida Rock repeats this characterization in a later brief, writing, "Under the Original Lease, the term of the lease would be 20 years unless commercially mineable reserves were sooner exhausted or unless Florida Rock exercised its termination right on 120 days' notice after the tenth anniversary." (Doc. 33, at 11-12.) In the same brief, Florida Rock contends that "the Original Lease stat[ed] that Florida Rock would have the ability to terminate the lease without cause upon 120 days' notice to Escambia beginning at the tenth anniversary." (*Id.* at 12.) Wholly missing from Florida Rock's discussion is any recognition of the central fact that the Original Lease limited Florida Rock's unilateral termination rights to the extension periods of the Lease, not the initial term.

[20] Much of Florida Rock's argument on this point stems from a misreading of the Original Lease. This is not a case in which the Original Lease called for a 20-year term, while conferring on Florida Rock a unilateral right of termination any time after year 10. (If it were, then Florida Rock's position in this litigation would be stronger. In that scenario, Florida Rock might persuasively argue that the Amendment merely traded out a 20-year term for a 40-year term, without disturbing available methods of termination during that term. But again, this is counterfactual to the actual terms of the Original Lease.) It is of paramount importance to the construction of the Lease that Florida Rock's without-cause termination rights were set forth in the Original Lease solely in the context of extension periods. When the Amendment destroyed the extension periods, it also destroyed the termination provisions attendant to those extension periods.

The bottom line is that, under any reasonable reading of the contract provisions, Paragraph 6 of the Amendment is inconsistent with Paragraph 3 of the Original Lease. Indeed, the Original Lease established a ten-year term with two five-year extensions that could be terminated via certain mechanisms. The Amendment replaced that term structure with a blanket 40-year term that expressly, necessarily eliminated the Original Lease's ten-year term, five-year extension periods, and termination triggers during said extension periods. Pursuant to Paragraph 1 of the Amendment, then, Paragraph 6 of the Amendment superseded and amended Paragraph 3 of the Original Lease. Except as restated in the Amendment, the termination triggers linked to the extension periods in the Original Lease were unambiguously abrogated by the Amendment. Accordingly, Florida Rock cannot invoke one such trigger (*i.e.*, its unilateral right to terminate the extension period without cause on 120-days' written notice) after the Amendment to terminate the Lease, as amended.

## III. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendant Escambia's Rule 12(c) Motion for Judgment on the Pleadings (doc. 26) is **granted**, and Plaintiff's Cross Motion for Judgment on the Pleadings (doc. 30) is **denied**;

2. The Court **declares** that, absent further amendment by the parties, the term of the subject Lease is 40 years from the original commencement date of September 14, 2005;

3. The Court further **declares** that Florida Rock does not have the contractual right under the terms of the Lease, as amended, to terminate the Lease without cause after September 13, 2015, by furnishing 120 days' written notice to Escambia Sand (although Florida Rock does have the right to terminate the Lease at any time on 120 days' notice if, according to commonly recognized industry standards, commercially mineable reserves of sand and gravel on the Leased Premises have been exhausted);

4. Plaintiff, Florida Rock, is entitled to no relief on the claims asserted in Counts One and Two of its Amended Complaint, and such claims for declaratory judgment are **denied** and **dismissed with prejudice**;

5. A separate judgment will be entered; and

6.      This Order and the accompanying Judgment resolving all claims, defenses, causes
        of action, and issues joined herein, the Clerk of Court is **directed** to close this file
        for administrative and statistical purposes.

DONE and ORDERED this 6th day of June, 2014.

                                        s/ WILLIAM H. STEELE
                                        CHIEF UNITED STATES DISTRICT JUDGE